UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| IDAHO CONSERVATION LEAGUE, IDAHO RIVERS UNITED, and GOLDEN EAGLE AUDUBON SOCIETY,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. FOREST SERVICE,<br><br>Defendant,<br><br>and<br><br>IDAHO CUMO MINING CORPORATION,<br><br>Intervenor-Defendant. | Case No. 1:16-CV-0025-EJL<br><br><br>**MEMORANDUM DECISION AND ORDER** |

**INTRODUCTION**

Pending before the Court in the above-entitled matter are the parties' Cross-Motions for Summary Judgment. The matters have been fully briefed and are ripe for the Court's consideration. Having fully reviewed the record, the Court finds that the facts and legal arguments are adequately presented in the briefs and record. Accordingly, in the interest of avoiding further delay, and because the Court conclusively finds that the decisional process

would not be significantly aided by oral argument, the Motions shall be decided on the record before this Court without a hearing.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1.    Procedural Background

The underpinnings of this action began in 2011 when the Plaintiffs filed suit in this Court challenging the United States Forest Service's ("Forest Service") approval of the CuMo Exploration Project ("CuMo Project" or "the Project"). *See Idaho Conservation League, et al., v. United States Forest Service*, Case No. 1:11-cv-00341-EJL, 2012 WL 3758161 (D. Idaho, Aug. 29, 2012). In that case, the Court vacated, in part, the Forest Service's decision approving the Project and remanded the matter to the Forest Service for further evaluation. (1:11-cv-00341-EJL, Dkt. 55.) Thereafter the Forest Service conducted further analysis and, in September of 2015, again approved the Project.

Plaintiffs, Idaho Conservation League, Idaho Rivers United, and Golden Eagle Audubon Society, filed the Complaint initiating this matter challenging the Forest Service's supplemental decisions and approval of the Project. (Dkt. 1.)[1] The Plaintiffs raise claims under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq*. ("APA"), alleging violations of the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq*. ("NEPA"); the Forest Service Organic Act of 1897, 16 U.S.C. § 551 ("the Organic Act"); and the National Forest Management Act, 16 U.S.C. § 1600 *et seq*.("NFMA"). (Dkt. 1.) The Forest Service answers

---

[1] Plaintiffs are non-profit corporations located principally in Boise, Idaho who have members, supporters, and staff who work, live, study, and recreate throughout Idaho who will be impacted by the CuMo Project. (Dkt. 2.)

**MEMORANDUM DECISION AND ORDER**    2

that its decisions and approval of the Project satisfies the applicable standards and requirements of those statutes. (Dkt. 10.) Idaho CuMo Mining Corporation ("Idaho CuMo"), the private mining exploration company seeking to undertake the Project, has been allowed to intervene as a Defendant in this case. (Dkt. 6, 20, 21.)[2]

The parties have all filed Motions for Summary Judgment that have been fully briefed and are ripe for the Court's consideration. (Dkt. 19, 25, 27.) The Forest Service has also filed a related Motion to Strike the Plaintiffs' Declarations which Idaho CuMo has joined. (Dkt. 23, 26.) The Court takes up all of these Motions in this Order.

## 2.     The Project

The CuMo Project is a five-year mining exploration project located on the Grimes Creek in the Boise River watershed within the Boise National Forest in Idaho. The Project Area encompasses approximately 2,885 acres of land in the Boise National Forest fourteen miles north of Idaho City, Idaho and five miles upstream from Pioneerville, Idaho. (CU080267-68, CU080301, CU083869.)[3] The area lies within the Boise-Mores sub-basin. There are four access routes into the Project Area and an existing temporary road network. (CU080268, CU083870.)

In 2007, Idaho CuMo submitted a new Plan of Operations ("PoO") seeking to modify

---

[2] Idaho CuMo was formerly named Mosquito Mining Corporation. (Dkt. 7-4, Ex. D.)

[3] The Project Area's 2,885 acres is less than one-percent of the Ranger District that totals about 470,500 acres. (CU080301.)

and replace an existing PoO[4] for the purpose of allowing expanded exploration activities for CuMo molybdenum prospect. In 2011 the Forest Service prepared an Environmental Assessment ("EA") and issued its first Decision Notice and Finding of No Significant Impact ("DN/FONSI") approving the Project. Operations on the Project began and were underway until this Court issued it's August 29, 2012 decision remanding the matter to the Forest Service for further analysis.

Following that ruling, in March of 2015, the Forest Service prepared a Supplemental Environmental Assessment ("SEA") which conducted further analysis of groundwater and addressed new information and changed circumstances that have occurred since the 2011 DN/FONSI was issued. (CU083853, CU083869.) The SEA considered three Project alternatives. Alternative A is the proposed action in the 2007 PoO. (CU083885.) Alterative B is the "Reduced Roads" alternative which addresses concerns over potential erosion and sedimentation to Grimes Creek. (CU083891.) Alternative C is the no action alternative which is included as a baseline from which to evaluate/compare the environmental effects of the two action alternatives. (CU083875, CU083879.) On September 30, 2015, the Forest Service issued its Supplemental Decision Notice and Finding of No Significant Impact ("SDN/FONSI") approving the CuMo Project and selecting Alternative B for implementation. (CU080263, CU080276.)

---

[4] Prior exploration activities have been conducted in the area dating back to 1963. (CU083867.) A PoO was developed in 2005 to allow drilling exploration holes in the area using the existing 4.7 mile network of unauthorized roads. Idaho CuMo's proposal seeks to modify and replace the existing 2005 PoO to expand the exploration activities. (CU083868.)

Under that decision, Idaho CuMo may conduct mineral exploration to delineate the extent of a copper/molybdenum mineral deposit in the Project Area. (CU083869, CU083875.) Alternative B allows for construction of up to 10.2 miles of new temporary roads and utilization of the 4.7 miles of existing unauthorized roads for the purpose of developing up to 137 drill pads. (CU080277, CU083891.) From those drill pads, Idaho CuMo may drill up to 259 holes ranging in length from 1,500 to 3,000 feet. (CU080277-78, CU083891.) The Project proposes using a closed-system drilling process where synthetic non-toxic, biodegradable polymer drill fluid will be re-circulated within the mud pits which will then be covered, compacted, and recontoured upon completion. (CU080277.) The operating season will run between April 15 and December 15 with drilling to be conducted on a 24-hour schedule. (CU080277-78.) Upon completion, all holes will be filled and sealed. The SEA specifies conditions for the number of drill rigs at a given time, the type of drill machines and water pumps to be used, the construction of any structures or sheds, on-site storage of drill consumables, spill prevention measures, and measures to be taken following the completion of the Project in terms of the holes, drill pads, mud pits, and roads. (CU080277-81.)

## STANDARD OF REVIEW

### 1.    Summary Judgment

Federal Rule of Civil Procedure 56 provides, in pertinent part, that the "Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

In order to withstand a motion for summary judgment, a party

> (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible.

*British Motor Car Distrib. v. San Francisco Automotive Indus. Welfare Fund*, 883 F.2d 371, 374 (9th Cir. 1989) (citation omitted).

The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party to "go beyond the pleadings" and "designate specific facts" in the record to show a trial is necessary to resolve genuine disputes of material fact. *Id.* The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Summary judgment is mandated if the non-moving party fails to make a showing sufficient to establish the existence of an element which is essential to the non-moving party's case and upon which the non-moving party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322.

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). For summary judgment purposes, an issue must be

both "material" and "genuine." An issue is "material" if it affects the outcome of the litigation. An issue is "genuine" if it must be established by "sufficient evidence supporting the claimed factual dispute...to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Hahn v. Sargent*, 523 F.3d 461, 464 (1st Cir. 1975) (quoting *First Nat. Bank v. Cities Serv. Co. Inc.*, 391 U.S. 253, 289 (1968)); *see also British Motor Car*, 883 F.2d at 374.

In considering a motion for summary judgment, the Court does not make findings of fact or determine the credibility of witnesses, *Anderson*, 477 U.S. at 255; rather, it must draw all inferences and view all evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587–88; *Whitman v. Mineta*, 541 F.3d 929, 931 (9th Cir. 2008). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587 (citation omitted).

## 2.    Administrative Procedure Act

Judicial review of administrative agency decisions is made under the APA. 5 U.S.C. § 702. Such review is based on the administrative record compiled by the agency – not on independent fact-finding by the district court. *Camp v. Pitts*, 411 U.S. 138, 142 (1973). APA claims may be resolved via summary judgment pursuant to the standard set forth in Rule 56. *See Nw. Motorcycle Ass'n v. United States Dept. Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994).

The claims in this case raise factual or technical disputes, implicating agency expertise, which are reviewed under the "arbitrary and capricious" standard. *See Price Rd.*

*Neighborhood Ass'n, Inc. v. United States Dept. of Transp.*, 113 F.3d 1505, 1508 (9th Cir. 1997) (discussing the two standards governing review of agency actions involving NEPA); *Alaska Wilderness Rec. & Tour. v. Morrison*, 67 F.3d 723 (9th Cir.1995). That standard requires the Court to determine whether the action is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). When applying this standard, courts grant substantial deference to the decisions and actions of federal agency defendants in adopting and implementing certain agency activities. *See Trout Unlimited v. Lohn*, 559 F.3d 946, 958 (9th Cir. 2009) (quoting *Nat. Wildlife Fed'n v. United States Army Corps of Eng'rs*, 384 F.3d 1163, 1174 (9th Cir. 2004) ("Where scientific and technical expertise is necessarily involved in agency decision-making, ... a reviewing court must be highly deferential to the judgment of the agency.")). This deference is particularly appropriate where, as here, the Court is reviewing "issues of fact," "where analysis of the relevant documents requires a high level of technical expertise." *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1206 (9th Cir. 2004).

"Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *MotorVehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Cascadia Wildlands v. Bureau of Indian Affairs*, 801 F.3d 1105, 1110 (9th Cir. 2015) (citations omitted). The scope of

**MEMORANDUM DECISION AND ORDER**   8

review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. *Id.* Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." *Id.* (citing *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)); *see also City of Sausalito*, 386 F.3d at 1206 (quoting *Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944, 953–54 (9th Cir. 2003)). In reviewing that explanation, the court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (citations omitted); *see also Marsh v. Or. Nat. Resources Council*, 490 U.S. 360, 378 (1989) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).The court may not overturn an agency decision simply because it disagrees with the decision or with the agency's conclusions about environmental impacts. *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010) (citations omitted). The "court may not substitute its judgment for that of the agency concerning the wisdom or prudence of the agency's action." *Id.* (citation and marks omitted).

**DISCUSSION**

**1.     Motions to Strike**

Judicial review under the APA requires that the review of the agency decision be based upon the evidence before the agency at the time the decision in question was made. *See Southwest Ctr. for Bio. Diversity v. United States Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996) ("Judicial review of an agency decision typically focuses on the administrative record

in existence at the time of the decision and does not encompass any part of the record that is made initially in the reviewing court."). There are a limited number of exceptions to the allowance of materials not contained in the administrative record: "(1) if admission is necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) if the agency has relied on documents not in the record, (3) when supplementing the record it is necessary to explain technical terms or complex subject matter, or (4) when plaintiffs make a showing of agency bad faith." *See Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005) (*quoting Southwest Ctr.*, 100 F.3d at 1450)).

A.    **Motion to Strike Declaration of Roger Rosentreter**

Roger Rosentreter is a botanist who reviewed the Forest Service's SDN/FONSI, SEA, and related materials. (Dkt. 19-3, Dec. Rosentreter.) Plaintiffs filed the Rosentreter Declaration in support of their Motion for Summary Judgment. The Declaration offers Rosentreter's opinion concerning the Project's impact on the Sacajawea's bitterroot and the Forest Service's findings and decision approving the Project.

The Forest Service argues this Declaration should be stricken from the Court's consideration in reviewing the agency's decision under the APA because it is an improper "expert" opinion, was not part of the Administrative Record in this case, and was not before the agency nor relied upon by the Forest Service when it made its decision at issue in this case. (Dkt. 23.) Moreover, the Forest Service contends, the Declaration is not offered to show that it has failed to satisfy its statutory obligations in reaching its decision but is instead being used to improperly argue the Forest Service reached the wrong conclusion and dispute the

merits of that decision. Idaho CuMo makes similar arguments and also notes that Mr.
Rosentreter's opinions were not submitted to the Forest Service during the administrative
proceedings. (Dkt. 26.) Plaintiffs maintain the Rosentreter Declaration is that of an expert
outside of the administrative record properly submitted to help explain complex and
scientific information and to show that the Forest Service failed to meet its statutory
obligation to consider relevant factors and explain its decision concerning the Project's
impacts on Sacajawea's bitterroot. (Dkt. 32.) [5]

The Plaintiffs point to the "NEPA exception." (Dkt. 42.) In *Nat. Audubon Soc. v.
United States Forest Serv.*, the Ninth Circuit recognized that "certain circumstances may
justify expanding review beyond the record" where, for example, "an allegation that an EIS
has failed to mention a serious environmental consequence may be sufficient to permit the
introduction of new evidence outside of the administrative record...." 46 F.3d 1437, 1447 (9th
Cir. 1993) (quoting *Animal Def. Council v. Hodel*, 867 F.2d 1244 (9th Cir. 1989)). There the
Ninth Circuit stated:

> the district court may extend its review beyond the administrative record and
> permit the introduction of new evidence in NEPA cases where the plaintiff
> alleges "that an EIS has neglected to mention a serious environmental
> consequence, failed adequately to discuss some reasonable alternative, or
> otherwise swept stubborn problems or serious criticism under the rug."

*Id.* (quoting *County of Suffolk v. Sec. of the Interior*, 562 F.2d at 1384-85 (citations omitted)).

Thus, the Court may "look beyond the record insofar as it is intended to show that [the

---

[5] Plaintiffs also argue the Declaration is relevant to show irreparable harm in the event
they seek a preliminary injunction in this case. (Dkt. 32.) Because injunctive relief is not
currently at issue, the Court has not addressed this argument.

agency's] research or analysis was inadequate." *Headwaters, Inc. v. BLM Medford Dist.*, 665 F. Supp. 873, 876 (D.Or. 1987). In other words, evidence outside the record may be admissible if such evidence is "necessary to determine whether the agency has considered all relevant factors and has explained its decision...." *Southwest Ctr.*, 100 F.3d at 1450.

Plaintiffs argue that under the "NEPA exception" the Court can consider the Rosentreter Declaration to determine whether the Forest Service considered all relevant factors or explained its course of conduct or grounds for its decision. (Dkt. 32.) Essentially, that the Rosentreter Declaration explains how the Forest Service failed to consider the important and relevant factors/impacts and explain the basis for its decision as required by statute. Defendants dispute that this Declaration should be admitted under the "NEPA exception" or any of the four "narrow exceptions" to the general rule for administrative records. (Dkt. 40, 41.) Further, Defendants argue the Rosentreter Declaration's disagreement with the Forest Service's conclusions is not a basis for supplementing the administrative record nor have Plaintiffs sought to supplement the record.

The Court has considered the parties' arguments and concludes that the Rosentreter Declaration should be stricken. It is material outside of the Administrative Record in this case, was not considered by the Forest Service during the administrative process, and, therefore, is not proper for this Court to consider on this judicial review. The Motion to Strike is granted as to the Rosentreter Declaration. The Court has not considered the same in reaching its ruling herein.

**B.     Motion to Strike Declarations of John Robinson, Kevin Lewis, and Sean Finn**

John Robinson is the Public Lands Director for the Idaho Conservation League. (Dkt. 19-4, Dec. Robinson.) Kevin Lewis is the Conservation Director for Idaho Rivers United. (Dkt. 19-5, Dec. Lewis.) Sean Finn is a volunteer, member, and current Board President of the Golden Eagle Audubon Society. (Dkt. 19-6.) These individuals each filed Declarations stating how they are familiar and have been involved with the Project and regularly use, recreate, and enjoy the Project Area. The Declarations state these individuals' concerns regarding the Project's impact on the area vegetation, wildlife, recreational opportunities, and water quality.

The Forest Service argues these Declarations are "irrelevant extra-record evidence" that should not be considered because there is no challenge to the Plaintiffs' standing in this case. (Dkt. 23.) Idaho CuMo also argues these Declarations are outside the record and should be stricken. (Dkt. 26.) Plaintiffs respond that the Declarations are proper to demonstrate their Article III standing and that the Court should consider them for that purpose. (Dkt. 32.) Defendants do not oppose the Declarations for consideration solely to establish standing but maintain that paragraphs that go beyond standing should be stricken. (Dkt. 40, 41.)

The Court finds these Declarations are appropriate for purposes of satisfying the Plaintiffs' jurisdictional burden to show Article III standing in this case and the Court will consider them only for that purpose. The Court has not considered the Declarations for any

other purpose when deciding the Motions for Summary Judgment. The Motion to Strike is denied as to the Declarations of Robison, Lewis, and Finn.

**2.     Motions for Summary Judgment**

**A.     NEPA Claims**

The Complaint raises two NEPA claims with regard to the Project's impacts on the Sacajawea's bitterroot and groundwater alleging the Forest Service violated the statute by failing to 1) take the requisite "hard look" and 2) prepare an environmental impact statement ("EIS"). (Dkt. 1 at ¶¶ 64-72.)

**1.     NEPA's "Hard Look" Requirement**

The National Environmental Policy Act ("NEPA") "is our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA is a procedural statute that "does not mandate particular results but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions."*San Diego Navy Broadway Complex Coalition v. United States Dept. of Def.*, 817 F.3d 653, 659 (9th Cir. 2016) (quoting *Muckleshoot Indian Tribe v. United States Forest Serv.*, 177 F.3d 800, 814 (9th Cir.1999)) (internal quotation marks omitted). NEPA exists "to protect the environment by requiring that federal agencies carefully weigh environmental considerations and consider potential alternatives to the proposed action before the government launches any major federal action." *Lands Council*, 395 F.3d at 1026. "NEPA requires federal agencies to examine and disclose the environmental impacts of their proposed actions." *Pac. Coast Fed'n of Fishermen's Ass'n v. Blank*, 693 F.3d 1084, 1088 (9th Cir. 2012); *see also* 42

**MEMORANDUM DECISION AND ORDER     14**

U.S.C. § 4332. The purpose of NEPA is: "(1) to ensure that agencies carefully consider information about significant environmental impacts and (2) to guarantee relevant information is available to the public." *Northern Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1072 (9th Cir. 2011). "In order to accomplish this, NEPA imposes procedural requirements designed to force agencies to take a 'hard look' at environmental consequences." *Lands Council*, 395 F.3d at 1027 (citation omitted).

When reviewing an agency's decision, the court's role is to determine whether the agency took the requisite "hard look" that NEPA demands and provided "a reasonably thorough discussion" of the probable, significant environmental consequences of the proposed action. *Nat. Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1072 (9th Cir. 2010). Courts review an EA "to determine whether it has adequately considered and elaborated the possible consequences of the proposed agency action when concluding that it will have no significant impact on the environment." *San Diego Navy Brdwy. Complex Coal.*, 817 F.3d at 659 (quoting *San Luis Obispo Mothers for Peace v. Nuclear Regulatory Com'n*, 635 F.3d 1109, 1119 (9th Cir. 2011) (citation omitted)). In doing so, the court considers "whether the EA fosters both informed decision-making and informed public participation." *Id.* (citation omitted).

### 2.   NEPA's EIS Requirement

"NEPA requires that an [EIS] be prepared for all 'major Federal actions significantly affecting the quality of the human environment.' 42 U.S.C.A. § 4332(2)(C)." *Nat. Parks & Conservation Ass'n v. Babbitt*, 241 F.3d at 730 (abrogated on other grounds by *Monsanto Co.*

**MEMORANDUM DECISION AND ORDER**   15

*v. Geertson Seed Farms*, 561 U.S. 139 (2010)); *see also Ocean Advocates v. United States Army Corps of Eng'r*, 402 F.3d 846, 864-65 (9th Cir. 2005). That is to say, an "EIS must be prepared if 'substantial questions are raised as to whether a project ... may cause significant degradation of some human environmental factor.'" *Blue Mtns. Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) (citation omitted).

The regulations define "significantly" in NEPA as calling for an analysis of both "context" and "intensity." 40 C.F.R. § 1508.27; *Native Ecosystems Council v. United States Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005) ("In benchmarking whether the [] Project may have a significant effect on the environment, we turn to the NEPA regulations that define "significantly." 40 C.F.R. § 1508.27 (2000)). "Context" is "society as a whole (human, national), the affected region, the affected interests, and the locality." 40 C.F.R. § 1508.27(a). Intensity "refers to the severity of impact" and is evaluated or measured by certain listed factors. 40 C.F.R. § 1508.27(b).[6]

---

[6]

"The following should be considered in evaluating intensity: (1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial. (2) The degree to which the proposed action affects public health or safety. (3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas. (4) The degree to which the effects on the quality of the human environment are likely to be highly controversial. (5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks. (6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration. (7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts. (8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources. (9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973. (10)

(continued...)

**MEMORANDUM DECISION AND ORDER**   16

In reviewing an agency's decision not to prepare an environmental impact statement, the question is "whether the agency took a 'hard look' at the potential environmental impact of a Project." *Blue Mts.*, 161 F.3d at 1212. Courts use the arbitrary and capricious standard when reviewing an agency's decision to not complete an EIS. *Id.* at 1211. Under that standard, the court must determine whether the agency has taken the requisite "hard look" at the environmental consequences of the proposed actions, based its decision on a consideration of the relevant factors, and provided a convincing statement of reasons explaining why the Project's impacts are insignificant. *See Metcalf v. Daley*, 214 F.3d 1135, 1141 (9th Cir. 2000), *Blue Mts.*, 161 F.3d at 1211. "A full [EIS] is not required if the agency concludes after a good hard look that the proposed action will not have a significant environmental impact." *Tillamook Cnty. v. United States Army Corps of Eng'rs*, 288 F.3d 1140, 1144 (9th Cir. 2002).

An agency may first prepare an EA to decide whether the environmental impact is significant enough to warrant preparation of an EIS or if a FONSI should be issued. An EA is a "concise public document ... [that] [b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. 1508.9. An EA is arbitrary and capricious if it fails to consider an important aspect of the problem, or "offer[s] an explanation that runs counter to the

---

[6](...continued)
Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment."
40 C.F.R. § 1508.27.

**MEMORANDUM DECISION AND ORDER**    17

evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Sierra Club v. United States Envtl. Prot. Agency*, 346 F.3d 955, 961 (9th Cir. 2003).

Where the agency concludes the action will not have a significant effect or where the effects will be mitigated to an insignificant level, the agency may prepare a FONSI in lieu of preparing an EIS. *Envtl. Prot. Info. Ctr. v. United States Forest Serv.*, 451 F.3d 1005, 1009 (9th Cir. 2006); *Wetlands Action Network v. United States Army Corps of Eng'rs*, 222 F.3d 1105, 1121 (9th Cir. 2000); 40 C.F.R § 1508.13. 40; C.F.R. 1508.9(a)(1). An agency cannot, however, "avoid preparing an EIS by making conclusory assertions that an activity will have only an insignificant impact on the environment." *Ocean Advocates*, 402 F.3d at 864. The agency "must supply a convincing statement of reasons to explain why a Project's impacts are insignificant." *Blue Mts.*, 161 F.3d at 1212 (internal quotations omitted).

"[A]n EIS must be prepared if 'substantial questions are raised as to whether a project ... may cause significant degradation of some human environmental factor.'" *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1149 (9th Cir. 1998) (quoting *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1332 (9th Cir. 1992)). "To trigger this requirement a 'plaintiff need not show that significant effects will in fact occur,' [but] raising 'substantial questions whether a project may have a significant effect' is sufficient." *Id.* at 1150 (quoting *Greenpeace*, 14 F.3d at 1332).

**MEMORANDUM DECISION AND ORDER**     18

### 3.    Sacajawea's bitterroot

Sacajawea's bitterroot (*Lewisia sacajaweana* or "LESA") is a rare small, ground-hugging perennial herb endemic to the mountains of central Idaho with eighty percent of the known populations existing in the Boise National Forest. (CU084009, 084036.) The population within the Project Area is the largest known LESA population. (CU084036.) LESA has been designated as a "<u>sensitive species</u>" and classified as "<u>critically imperiled</u>" making it the highest priority rare plant species managed by the Boise National Forest. (CU084004) (emphasis added.) The SEA notes LESA's populations and habitat have been or are likely to be lost due to various past and ongoing factors. (CU084010-14, CU084039.)

The SEA concludes that the cumulative effects on rare plants, including LESA, would range from "no impact" to "may impact individuals, but would not likely contribute to a trend toward federal listing or loss of viability of populations or species." (CU084036.) In terms of LESA in particular, the Forest Service finds the conservation of the species could be impacted but the impact would be avoided in many cases and, where avoidance is not possible, the impacts would be minimized to the Maximum Extent Practicable ("MEP") based on the Project's design features and mitigation measures combined with implementation and effectiveness monitoring. (CU084036.)

### a.    "Hard Look" Requirement

Plaintiffs argue the Forest Service failed to take the requisite "hard look" with regard to Sacajawea's bitterroot in three ways: 1) not fully reviewing the Project's impacts on the species, 2) relying on an inadequate pre-fire baseline for the species, and 3) failing to provide

quantified or detailed information on the fire's cumulative impacts. (Dkt. 19.) On the first point, Plaintiffs argue the Forest Service has not quantified the amount of activity the Project will undertake in LESA's occupied habitat or potential habitat. As a result, the extent of the impacts on the species – such as how many plants will be destroyed, how much habitat fragmentation will occur, or how much dust will be generated – are unknown. (Dkt. 19 at 13.) The next two points concern the impact from a July 2014 wildfire (the "Grimes Fire") and related fire suppression activities that passed through the densest portion of habitat for Sacajawea's bitterroot in the Project area. (CU084013.) Plaintiffs argue the Forest Service violated NEPA by relying on obsolete pre-fire baselines and failing to reestablish new data upon which to evaluate the extent of any potential impacts on the species. (Dkt. 19 at 14.) Further, Plaintiffs argue the Forest Service failed to take a hard look at the fire's cumulative impacts on LESA through any quantified or detailed analysis. (Dkt. 30 at 15-16.)

Defendants maintain the Forest Service considered the effects of the Grimes Fire. (Dkt. 24 at 5-8) (Dkt. 27 at 13.) Pointing to the Project's design features – requiring avoidance/minimizing impacts on LESA and re-establishing the LESA population baseline prior to Project operations beginning – and the monitoring and mitigation measures, the Defendants argue, any impacts on the species will be within those disclosed in the SEA. (Dkt. 24 at 4-8, 19-20) (Dkt. 27 at 13-14.) Having reviewed the entire administrative record, the Court finds as follows.

The SEA's cumulative impact analysis includes a section discussing the potential effects of the Grimes Fire and fire suppression activities on the Sacajawea's bitterroot

including ground disturbance and the cutting and piling of vegetation. (CU083995, CU084013.) That section cites to an August 2014 report by Forest Service botanist Kathryn Beall (the "Beall Report") who visited the Project area at the location of the Grimes Fire for the purpose of assessing the scale and scope of the fire and suppression efforts on the LESA population and to determine if additional analysis, updates, and/or addendums were needed for the SEA. (CU072073.) No LESA plants were visible during Beall's field review, however, because it was conducted after the plants had flowered and gone dormant. The SEA recognizes as much stating:

> the short-term impacts of the Grimes Fire and suppression activities on LESA reproduction and pollinators, as well as long-term effects on LESA and its supporting habitat, could not be fully assessed in 2014 because the flowering season had already passed by the time suppression efforts concluded.

(CU084014.) The Beall Report noted, however, that previous visits had mapped plant locations and left monitoring flags which remained intact following the fire. The Beall Report states that given the timing of the fire – during the plant's early stages of dormancy – and the lack of evidence of direct burning at the previously mapped/marked plant sites, "that most of the Sacajawea's bitterroot in the burn area escaped major direct impacts from the fire" but that "there may be unseen effects." (CU072074.) The Beall Report goes on to state, however, that the impact of the fire and fire suppression activity could be "potentially large in scope in terms of impact to the CuMo population of the plant" and "needs re-evaluation in light of changed conditions." (CU072075.) The Beall Report recommends updates and amendments to reflect the changed conditions to LESA habitat, additional filed

data, and analysis of the potential effects of the fire and related suppression activities.

Idaho CuMo argues the Beall Report shows the impacts from the Grimes Fire were considered by the Forest Service and that most of the LESA population in the burn area escaped major direct impacts from the fire. (Dkt 24 at 7.) Plaintiffs dispute Idaho CuMo's interpretation of the Beall Report; arguing the report actually concludes that the impacts of the fire and, more significantly, the fire suppression activities may have a "potentially large" scope of impact on the LESA population in the Project area. (Dkt. 30 at 17-18.) This report, Plaintiffs argue, raises questions about the potentially significant impacts on the LESA population in the area that have not been adequately considered and addressed by the Forest Service. The Court agrees.

The SEA summarizes the Beall Report's findings (CU084013) and also recognizes its recommendation that baseline data needs to be re-established. (CU083915.) The SDN/FONSI also recognizes that the baseline data from 2011 needs to be re-established due to the Grimes Fire and related suppression activities. (CU080332, CU080344.) In reaching its conclusions concerning the Project's impact on LESA, however, the Forest Service did not conduct the re-evaluation recommended by its own botanist as necessary to analyze the "potentially large in scope" impact of the Project on LESA. Instead, the Forest Service proposes approving the Project and then, prior to starting activities, completing the re-evaluation of LESA's baseline. (CU083915, CU080332, CU080344-51.) This approach improperly delays NEPA's "hard look" analysis.

The Forest Service recognizes the baseline data needs to be re-established following the 2014 Grimes Fire but instead of compiling and analyzing that data up front, the Forest Service has incorporated those NEPA steps into the Project itself. The selected Alternative B anticipates conducting a new baseline study during the Project and then monitoring and mitigating to protect the LESA species. (CU080344-51.) This approach puts the cart before the horse by prematurely asking for approval of the Project before the necessary baseline data and analysis are conducted. NEPA demands that the Forest Service analyze a project's impacts before it is approved; not as part of the Project itself. *See N. Plains*, 668 F.3d at 1083 (holding that "[b]ecause the [EIS] does not provide baseline data for many of the species, and instead plans to conduct surveys and studies as part of its post-approval mitigation measures, we hold that the Board did not take a sufficiently 'hard look' to fulfill its NEPA-imposed obligations at the impacts as to these species prior to issuing its decision.") (citing *LaFlamme v. F.E.R.C.*, 852 F.2d 389, 400 (9th Cir. 1988) ("[T]he very purpose of NEPA's requirement that an EIS be prepared for all actions that may significantly affect the environment is to obviate the need for speculation by insuring that available data is gathered and analyzed prior to the implementation of the proposed action.") (internal citation and quotation marks omitted))). The Court finds the Forest Service's approach in this case violates NEPA.

Knowing the Grimes Fire and fire suppression activities directly affected the area, the Forest Service none the less concluded the Project would have no significant impact on LESA without conducting the recommended re-evaluation. This is made all the more troubling by the Forest Service's recognition of the rareness of the LESA plant, its location

in the Project area, and the increasing and notable risks to LESA's viability. (CU084003-04, CU084009-14, CU084036.) In this respect, the Court concludes that the Forest Service's finding of no significant impact is arbitrary and capricious because it lacks the necessary baseline data upon which the Forest Service can conclude that the Project will have no significant impact on the LESA species. The "hard look" required by NEPA demands that the agency analyze the current state of this rare and protected species which it knows and recognizes to be at risk, located in the Project area, and likely to be impacted by the Project's activities. *N. Plains*, 668 F.3d at 1083 ("Once a project begins, the pre-project environment becomes a thing of the past and evaluation of the project's effect becomes simply impossible.") (citation and marks omitted). By failing to undertake such an analysis, the Forest Service's conclusions regarding LESA are arbitrary and capricious.[7]

The Forest Service cannot know the impact the Project will have, let alone conclude whether or not its impact is significant, without having accurate baseline data for LESA in the Project Area. What is known and recognized in the SEA and SDN/FONSI is that the LESA species is very rare, a large portion of its population is located within the Project Area,

---

[7] The Court's 2011 decision concluded the EA's "consideration and explanation of the Project's impacts on Sacajawea's bitterroot to be in accord with what is required by NEPA in that the Forest Service's decisions were not arbitrary and capricious. The impacts to Sacajawea's bitterroot have been analyzed and monitoring and mitigation efforts employed to minimize those impacts." (Case 1:11-cv-00341-EJL, Dkt. 55 at 29.) The reason for the opposite outcome today is that the change in conditions resulting from the 2014 Grimes Fire and related suppression activities have not been accounted for despite the Forest Service's recognition of the need to re-examine the baseline data. For the reasons stated herein, the Court finds the Forest Service's SDN/FONSI is arbitrary and capricious because it failed to accurately assess the current conditions of the LESA population before approving the Project in violation of NEPA.

it is protected, and its future is at risk. (CU084036.) Because the baseline data for LESA following the 2014 Grimes Fire is unknown, the Forest Service has not adequately considered the Project's impact on the species, nor can it without the necessary data.

The Defendants' reliance on the Project's design features, monitoring, and mitigation measures does not cure the failure to re-evaluate and analyze the Project's impact on LESA following the Grimes Fire. (Dkt. 27 at 12-14) (Dkt. 24 at 4-8.) The Project's design features include requirements such as avoidance of LESA plants where possible and, if not possible, minimizing the Project's impacts on LESA plants to the MEP. (CU080394.) Another design feature in the selected Project Alternative B, includes establishing Plant Conservation Areas ("PCA") of 300 meters surrounding occupied LESA habitat to mitigate direct and indirect effects of the Project activities on LESA plants, their pollinators, and associated habitat. (CU080320, CU080394, CU083902, CU084003-04, CU084019.) The PCAs includes four concentric rings or buffer zones: Ring 1 – occupied habitat; Ring 2 – outer extent of occupied habitat plus 20 meters; Ring 3 – outer extent of occupied habitat plus 100 meters; and Ring 4 – outer extent of occupied habitat plus 300 meters. (CU080320, CU080394, CU083902, CU084004.) The Project activities permitted within each of the rings are detailed, by activity, in the SEA and the corresponding Checklist. (CU080321-30, CU083902-09, CU080394-98.) For activities outside of current PCAs, the SEA requires that "prior to any new road or drill pad construction, LESA surveys will be conducted for at least one growing season during the LESA flowering period to determine presence or absence of LESA plants." (CU080330, CU083909.) If LESA plants are found outside of the current PCAs, the four concentric

rings/buffer zones and the applicable mitigation measures will be applied to the areas containing newly found plants. (CU080330, CU083909.)

The Project's monitoring program includes both implementation and effectiveness monitoring elements to ensure LESA design features and mitigation are being implemented as intended and that the effects assumed do not exceed those anticipated. (CU080332, 083915-17, CU080344-51.) If unexpected changes are identified, the Project proposes to make adjustments to the mitigation measures to ensure impacts to LESA are within the range of effects detailed in the SEA. (CU080333, CU083915.) The mitigation measures and monitoring also require Idaho CuMo to complete a Checklist and receive Forest Service approval before building any road or drill pad. (Dkt. 27 at 12) (Dkt. 24 at 6, n. 3) (CU080332-33.)

The Court does not dispute that these elements of the Project – the design features, monitoring, and mitigation measures – may very well be effective in protecting the LESA plants and habitat. The problem with the Forest Service's reliance on those Project elements, however, is the lack of a post-fire re-evaluation analysis of the current LESA population before the Project is implemented. Federal regulations define "mitigation" as a way to avoid, minimize, rectify, or compensate for the impact of a potentially harmful action. 40 C.F.R. §§ 1508.20(a)-(e). An agency can rely upon mitigation measures in determining whether an environmental impact is significant. *See Babbitt*, 241 F.3d at 734. In order to be effective, however, a mitigation measure must be supported by analytical data demonstrating why it will "constitute an adequate buffer against the negative impacts that may result from the

**MEMORANDUM DECISION AND ORDER**     26

authorized activity." *Id.* A mitigation measure must render potential impacts "so minor as to not warrant an EIS." *Id.* A court must be able to review, in advance, how specific measures will bring projects into compliance with environmental standards. *Id.* at 733 ("The Parks Service proposes to increase the risk of harm to the environment and then perform its studies.... This approach has the process exactly backwards."). Without accurate baseline data before the Project begins, it is impossible to know whether and to what extent the Project's activities will impact LESA even with the proposed design features, monitoring, and mitigation features. As thorough as these features of the Project appear to be, the Forest Service's failure to re-evaluate LESA's current baseline leaves too much unknown for the Forest Service to have concluded that the Project will not have a significant impact on the LESA population.

Similarly, the implementation and effectiveness monitoring may be valuable to determine the appropriateness of the mitigation measures, but they can not be used to replace the "hard look" the Forest Service is required to take before approving the Project. NEPA requires the Forest Service to analyze the impact the Project's activities will have on the environment and, in particular here, on the LESA plant and habitat. The Forest Service has not done so. Further, the monitoring will not ameliorate potentially serious negative impacts of the Project on LESA. The monitoring will only show the damage that is done by the Project with the possibility of adjustments being made after the fact if the Project's activities are more damaging than desired. This is not what was contemplated by NEPA.

**MEMORANDUM DECISION AND ORDER**     27

Defendants also point to a July 2015 LESA Field Survey ("2015 Survey") to support their position that the Forest Service took a "hard look" the impacts to LESA and to support the SEA's conclusion that the Project will avoid direct significant impacts to LESA. (Dkt. 24 at 4-7) (Dkt. 37 at 4) (Dkt. 38 at 6.) The July 2015 survey report is a clearance survey for four sensitive plant species, including LESA, at 44 proposed drill pad locations and six access roads. (CU062315, 21-22.) Idaho CuMo argues this survey shows the Forest Service considered the effects of the Grimes Fire and suppression activities and reveals that more Sacajawea's bitterroot plants were found in 2015 in the burn area than in 2011. (Dkt. 24 at 7) (Dkt. 37 at 4.) Plaintiffs dispute that conclusion arguing the July 2015 survey was not comprehensive, limited in size, found only 4,151 of the 13,000 previously found at the Project site, and fails to address the impact of the Grimes Fire and suppression activities on LESA. (Dkt. 30 at 18-19.)

The 2015 Survey was "focused on determining the presence of LESA plants in areas proposed to be disturbed" by the Project with a survey area smaller than previous surveys given its focus. (CU062333.) The survey located LESA within 70 feet of 13 out of the 44 proposed drill pads surveyed. Three of the drill pads had LESA plants within the proposed drill pad footprint and 10 proposed drill pads containing LESA potential habitat had no LESA plants observed within 70 feet. (CU062334.) The recommendation of the survey is that the Project activities will avoid known LESA plants at 30 of the proposed drill pads and the mitigation recommendations will avoid direct impact at the remaining proposed drill pads.

**MEMORANDUM DECISION AND ORDER**     28

Although the 2015 Survey notes the Grimes Fire as an existing disturbance of LESA habitat, it does not analyze the comprehensive or cumulative impacts of the fire or fire suppression activities on LESA in the Project Area. The survey provides a recent field count of LESA but is limited to the "focused" area – the 44 proposed drill pad sites – surveyed. Thus, this survey is informative to the extent it identifies direct potential impacts to LESA at those 44 proposed drill pads but it does not provide up-to-date baseline data upon which the impacts from the Grimes Fire and related fire suppression activities could be analyzed Project-wide.

In sum, the Court finds the Forest Service's analysis and conclusions to be arbitrary and capricious because it failed to re-examine the baseline LESA population in the Project area following the 2014 Grimes Fire. Instead of compiling and analyzing the updated data it acknowledges is needed to accurately evaluate the Project's impacts on LESA, the Forest Service proposes undertaking the data collection and evaluation as part of the Project itself. This approach improperly postpones the analysis required by NEPA until the Project has already been approved and started. *N. Plains*, 668 F.3d at 1083. For these reasons, the Court will grant the Plaintiffs' Motion for Summary Judgment on this NEPA claim.

### b.  EIS Requirement

The SEA and SDN/FONSI conclude that no EIS is necessary because the CuMo Project will not significantly impact the environment. (CU080263, CU083853.) Plaintiffs challenge this finding arguing an EIS is required because the Project has potentially significant impacts on the Sacajawea's bitterroot. (Dkt. 19 at 7.) Defendants maintain an EIS

is not required in this case because its SDN/FONSI satisfies NEPA. (Dkt. 24 at 15-18) (Dkt. 27 at 9-14.)

The Court has concluded above that the Forest Service's analysis of the Project's impacts on the LESA population in the Project Area was arbitrary and capricious. On that basis, the Court will grant the Plaintiffs' Motion for Summary Judgment. In doing so, the Court is not finding that an EIS is required in this case. Instead, the Court will direct the Forest Service to re-evaluate the LESA baseline taking into consideration the impacts from the 2014 Grimes Fire and fire suppression activities and to then take the requisite "hard look" at that data in making its determination as to whether the Project's activities will have a significant impact such that an EIS must be prepared or if a finding of no significant impact may issue.

### 4.    Groundwater

In its prior decision, the Court found the Forest Service's analysis and conclusion that the Project's had no significant impact on groundwater was arbitrary and capricious. (Case 1:11-cv-00341-EJL, Dkt. 55 at 30-37.) In particular, the Court disagreed with the Forest Service's reliance on the use of a "closed drilling" method to reach its conclusion; finding the Forest Service failed to consider the impact the drilling itself would have on the hydrology of the groundwater. Additionally, the Court concluded that the Forest Service violated NEPA by failing to conduct a baseline hydrogeologic study and relying instead on surface water quality levels. The Court vacated that portion of the 2011 EA and remanded the matter to the Forest Service to undertake further analysis concerning groundwater. The

**MEMORANDUM DECISION AND ORDER**    30

Defendants assert the SEA and SDN/FONSI have properly considered the Project's impact on groundwater in accordance with NEPA.

### a.    "Hard Look" Requirement

Plaintiffs argue Forest Service failed to take a hard look at groundwater impacts by not having an adequate baseline and relying on future monitoring; failing to address concerns about unlined waste pits and impacts of concentrated drilling; and not evaluating the cumulative impacts and connected action of the Project's activities on adjacent private land. (Dkt. 19.) The Forest Service responds arguing the SEA properly analyzes the Project's impacts on groundwater in compliance with NEPA by updating its baseline and analysis; addressing concerns regarding waste pits and concentrated drilling; and considering actions on adjacent lands. (Dkt. 27.) Idaho CuMo argues the Forest Service took a hard look at groundwater hydrology and the Project's impacts on the area. (Dkt. 24 at 9-14.)

The groundwater supplemental technical report was revised in February of 2015 for this Project to summarize the existing condition of the groundwater in the vicinity of the Project and identify the potential effect of the Project on that groundwater. (CU071885.) This supplement details the historic exploratory drilling and mining activities and geological condition of the Project area. The supplement is the source of the SEA's discussion of surface water quality, groundwater, environmental consequences and mitigation, and its conclusions concerning the effects of the Project activities on groundwater and water quality. (CU083973.)

The SEA includes updated sections on groundwater. (CU080282-83.) The SEA notes "[s]pecific information on hydrolithologic units and aquifer systems is lacking within the Project Area" but that a groundwater system is presumed to occur. (CU083965-66.) The SEA outlines the "expected configuration of the hydrolithologic units and aquifer system." (CU083965-66.) This "expected configuration" is based on historic drilling and geological materials, as well as domestic wells, and the visible geological structures – fractures and jointing – in the area. (CU083965-67.)

Section 3.1 of the SEA includes additional information about the Project Area's geology to support the groundwater analysis and the disclosures stated in Section 3.2.2. (CU083933.) These sections note that the Project is located in the Boise Basin which is underlain primarily by granitic rocks that have been intruded by Tertiary stocks and dikes. (CU083938.) Bedrock mapping from historic exploration projects outlined five general rock types. The trending faults run northeast with vein deposits being found in fractures related to the regional northeast-trending faults and, similarly, mineral deposits being found in northeast trending dikes. Prior drilling encountered varieties of quartz, intrusive breccia, and mafic dikes.

The SEA also details the hydrolithologic units and properties of the Project Area. (CU083973.) The Forest Service looked at data gathered from drilling in the Project Area to confirm that the igneous rocks are generally impervious and do not form primary aquifers. Three types of aquifers are found in the Project Area that are secondarily formed by the rock's faulting or fracturing. The first is the near-surface "perched aquifer" occurring at a

depth of approximately 200 to 300 feet and is present over the entire Project Area. The perched aquifer is found in rock that is highly fractured and weathered. (CU083947, CU083973.) The remaining two types of aquifers are deeper and include 1) a hydrolithologic unit present in localized parts of the project area and 2) a less significant unit found in association with the surface drainages. (CU083973.) The deeper rock in the area – below 300 feet – have limited fractures and joints and, therefore, have fewer aquifers except along major fracture zones and faults. (CU083947, CU083973.) These deeper aquifers are encountered on a limited basis when drilling through fracture zones and may have flowing artesian conditions. The groundwater found in the near-surface aquifers generally move parallel to the ground – to the west-southwest – and likely have some connection to surface water systems. (CU083974.) The direction of flow in the deeper aquifers is unknown but likely follows the faults and fractures.

Based on the foregoing record, the Forest Service concluded that the Project will have no significant impact on groundwater. (CU080296-98) (CU080301-02.) The Court finds the Forest Service's conclusions regarding groundwater are not arbitrary or capricious as they are supported by material throughout the SEA and in the administrative record. The record evidences that the Forest Service took a hard look at the Project's impacts on groundwater in reaching its finding of no significant impact.

Plaintiffs fault the Forest Service for not identifying, inventorying, and mapping the surface water features that have been found to be connected to the groundwater in the Project area. (Dkt. 30 at 22.) In particular, Plaintiffs argue the Forest Service's failure to inventory

the numerous streams, springs, and seeps in the Project Area is contrary to its own Working Guide for Evaluating Groundwater Resources for Mineral Exploration Drilling ("the Guide"). (Dkt. 19 at 15) (Dkt. 30 at 21.) The Forest Service maintains that mapping would not be useful for this Project because the area does not contain a homogenous aquifer and the locations of the drill holes are not known. (Dkt. 27 at 16 n. 5) (Dkt. 38 at 11-12.) Idaho CuMo argues the Forest Service properly considered this issue. (Dkt. 24 at 12.)

The Court agrees with the Defendants. The Guide is an internal working document used for the purpose of enabling field units to conduct adequate analysis of groundwater resources and potential effects to those resources. (CU065009-37.) The Guide suggests using geologic maps, seeps/springs mapping, and other available information to assess groundwater movement. (CU065017-18.) It does not, however, mandate mapping in every circumstance. The Forest Service responded to an objection from Plaintiffs made during the comment period on this issue noting that the permeability of the bedrock in the Project Area is controlled by fractures and that mapping the seeps and springs to predict groundwater depths would not be helpful because the area does not contain a homogeneous aquifer. (CU086787.) The Forest Service goes on to conclude that the depth to groundwater has little effect on its finding of no significant impact because there are no high-yield aquifers in or near the Project Area that could be impacted. These determinations are afforded deference as it involves a high level of technical expertise by the agency. *City of Sausalito*, 386 F.3d 1206. Having considered the entire record, the Court finds the Forest Service appropriately considered this

**MEMORANDUM DECISION AND ORDER**     34

issue in reaching its conclusion that mapping would not be useful in this case given the particular makeup of the Project Area. (CU086787.)

The Court also finds the Forest Service properly addressed the DEQ's concerns about unlined waste pits. In September of 2013, the Idaho Department of Environmental Quality sent a letter to the Forest Service expressing concerns over the proposed drilling and associated activities presented in the SEA; pointing specifically to Section 3.2 and Appendix H of the SEA. (CU058949, CU081338.) The DEQ noted the disposal of drilling fluids and drill cuttings in unlined waste pits have the potential to degrade water quality. (CU058950.) The DEQ recommended a program to monitor groundwater and surface water quality in the Project Area and proposed using a Quality Assurance Project Plan ("QAPP"). The Forest Service met with the DEQ on May 2, 2014 to discuss the September 2013 letter; in particular the DEQ's recommendation for a monitoring program. (CU084480-84.) Ultimately, a QAPP was developed for the Project. (CU080442-70.) While the DEQ cautioned that the QAPP should be updated once the Project begins and that additional detail may be required if Idaho CuMo seeks to proceed beyond the exploration phase, the DEQ concluded that the QAPP "appears to be sufficient for DEQ's data needs during this exploration phase of the project." (CU078836, CU078835-36.) Based on this record, the Court finds the Forest Service addressed the DEQ's concerns.

As to groundwater quality, the SEA discusses the Project's impact on water quality in light of the proposed drilling methods, mitigation, and monitoring – including the QAPP. (CU083898-900, CU083986-92.) The data for groundwater quality is limited to that collected

from the standpipe in Drill Hole #12 which has tapped into a seasonally variable flowing artesian condition at 1,340 feet. (CU083973-74.) From this sample, the Forest Service determined that the groundwater is within State water quality standards and there is a low likelihood of inherent contamination. (CU083974-75.) The Forest Service concluded that the Project would not have a significant impact on groundwater quality given the proposed drilling procedures and monitoring. (CU083991-92.) The Court concludes the Forest Service properly addressed concerns regarding groundwater quality.

Finally, the Court finds the Forest Service properly considered the Project's cumulative impacts and connected actions on adjacent private lands with regard to groundwater. The cumulative effects discussion in the SEA points to Appendix G which provides specific information of past, present, and reasonably foreseeable future activities on National Forest Service and private land in the area. (CU084248-254, CU083993-94.) Because the Project's impacts will be minimized through mitigation and monitoring procedures, the SEA concludes the cumulative impacts and connected actions are not significant. (CU083986-93.) Moreover, the SEA points out that any connected actions would be required to comply with all applicable federal and State requirements for water quality as well as other regulations governing projects and activities conducted in the area. (CU083993.) The Forest Service's reasoning and conclusions on this point are supported in the record and reasonable.

Based on the foregoing, the Court finds the Forest Service's analysis and conclusions regarding groundwater satisfy NEPA. The Forest Service has complied with the Court's prior

Order and addressed the concerns stated therein with regard to groundwater. Therefore, the Court upholds the Forest Service's SDN/FONSI as to the NEPA challenges relating to groundwater.[8] The Court denies the Plaintiffs' Motion for Summary Judgment and grants the Defendants' Motions for Summary Judgment as to the NEPA claims relating to groundwater.

### 5.    NEPA Conclusion

The Court finds the Forest Service has failed to consider an important aspect of the problem with regard to the changed circumstances for LESA as a result of the 2014 Grimes Fire and fire suppression activities. *See Motor Vehicles Mfrs. Ass'n*, 463 U.S. at 43; *Sierra Club*, 346 F.3d at 961 (EA is arbitrary and capricious if it fails to consider an important aspect of the problem.); *Blue Mts.*, 161 F.3d at 1212. While the Court finds no fault with the proposed design, monitoring, or mitigation features, NEPA requires the Forest Service to analyze the impact of the Project before it is implemented. *See N. Plains*, 668 F.3d at 1084 (holding mitigation measures are not alone sufficient to meet NEPA's obligations to determine the projected extent of the environmental harm to resources before a project is approved.). Without re-examining and analyzing the baseline data for LESA, the Forest Service's conclusion that the Project would not significantly impact the species is arbitrary and capricious. *Id.* at 1083 ("Once a project begins, the pre-project environment becomes a thing of the past and evaluation of the project's effect becomes simply impossible.") (citation and marks omitted). The Court finds the Forest Service has satisfied NEPA with regard to

---

[8] Because the Court has upheld the SDN/FONSI on this point, the Court will not discuss the NEPA claim alleging failure to prepare an EIS.

**MEMORANDUM DECISION AND ORDER**    37

groundwater concerns. But for the change in circumstances to the LESA species resulting from the Grimes Fire, the Court would be in a position to approve the Project.

The Court has afforded the Forest Service substantial deference in reaching this decision. *See River Runners*, 593 F.3d at 1070. The ruling stated herein does not second guess the Forest Service's conclusions but, instead, finds error in the Forest Service's analysis which failed to take a "hard look" at the Project's impacts on the environment with regard to a known rare and at risk plant. For the reasons stated herein, the Court will vacate the Forest Service's findings of no significant impact as to LESA. The Forest Service is directed to undertake the proposed re-evaluation of LESA's baseline forthwith and analyze the results for purposes of determining whether its decisions and conclusions with regard to LESA as stated in the SEA and SDN/FONSI are different or remain the same. The Forest Service may then file an amendment or addendum to the SEA and SDN/FONSI discussing their analysis, reasoning, and decision on that issue.

## B.    Violation of the Substantive Requirements of NFMA and the Organic Act

The Third and Fourth claims in the Complaint allege the Forest Service violated the substantive requirements of NFMA and the Organic Act by failing to protect Sacajawea's bitterroot and its habitat. (Dkt. 1 at ¶¶73-83) (Dkt. 19 at 19-20.)[9]

_____

[9] The Complaint contains one allegation relating to a violation of the Organic Act as to groundwater and water quality. (Dkt. 1 at ¶ 82(a).) Plaintiffs' briefing only discusses LESA. (Dkt. 19, 30.) Therefore, the Court has addressed that argument herein. For the reasons stated above in the Court's discussion concerning groundwater and water quality as to the NEPA claim, the Court concludes the Forest Service has not violated NFMA or the Organic Act.

NFMA imposes both procedural and substantive requirements for the management of National Forest lands. *See* 16 U.S.C. §§ 1600 *et seq.* "NFMA requires the Forest Service to develop comprehensive management plans for each unit of the National Forest System, 16 U.S.C. § 1604(a), and all subsequent agency action must be consistent with the governing forest plan § 1604(i)." *Greater Yellowstone v. Lewis*, 628 F.3d 1143, 1149 (9th Cir. 2010); *see also Earth Island Inst. v. United States Forest Serv.*, 351 F.3d 1291, 1300 (9th Cir. 2003) (citing 16 U.S.C. §§ 1604(a) and (i)).

> The NFMA sets forth the statutory framework and specifies the procedural and substantive requirements under which the Forest Service is to manage National Forest System lands. Procedurally, the NFMA requires the Forest Service to develop a forest plan for each unit of the National Forest System. 16 U.S.C. § 1604(a). In developing and maintaining each plan, the Forest Service is required to use a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences. § 1604(b). After a forest plan is developed, all subsequent agency action, including site-specific plans ... must comply with the NFMA and be consistent with the governing forest plan. § 1604(i).

*Id.* (citation omitted). The Organic Act was promulgated to provide a statutory basis for the establishment, management, protection, and care of national forests. 16 U.S.C. §§ 475, 551. These claims are brought pursuant to the APA and governed by the "arbitrary and capricious" standard. *See* 5 U.S.C. § 706.

The Complaint alleges the Forest Service violated NFMA and Standard BTST01 by failing to identifying the full extent of the LESA habitat at the Project site, ensure occupied habitat in desired conditions is maintained, and ensure occupied habitat is restored. (Dkt. 1

at ¶ 76.)[10] Additionally, the Complaint alleges the Forest Service violated NFMA by failing

to follow Guideline BTGU01 which requires it to conduct up-to-date surveys of Sacajawea's

bitterroot habitat and plant presence. (Dkt. 1 at ¶ 77.)[11] Similarly, the Complaint alleges the

Forest Service violated the Organic Act and its implementing regulations by failing to

minimize the Project's adverse environmental impacts on forest resources. (Dkt. 1 at ¶¶ 80,

82.)

Plaintiffs argue the Forest Service violated these statutes by failing to place any hard

limits making important areas off-limits to exploration and/or put any caps on the total

amount of harmful exploration activities allowed within the PCA or other plant habitat. (Dkt.

30 at 19-20.) Plaintiffs claim there are no measures included in the Project that are designed

to restored LESA habitat where it has been degraded. The Defendants' maintain the Forest

Service satisfied its legal obligations under both NFMA and the Organic Act. (Dkt. 27 at 14)

(Dkt. 37 at 10) (Dkt. 38 at 8-9.)

For the same reasons articulated in the preceding sections, the Court finds no fault

with the Project's proposed design features, monitoring measures, and mitigation with

respect to LESA. The Project provides for avoidance, monitoring, and mitigation measures

---

[10] Standard BTST01 requires "Management actions that occur within occupied sensitive plant species habitat must incorporate measures to ensure habitat is maintained where it is within desired conditions, or restored where degraded." (CU053832.)

[11] Guideline BTGU01 states "For site/project-scale analysis, suitable habitat should be determined for Sensitive species within or near the project area. Conduct surveys for those species with suitable habitat to determine presence. Document the rationale for not conducting surveys for other species in the project record." (CU053833.)

designed to maintain and minimize the impact on the LESA population in the Project Area to the maximum extent possible. (CU080320-30.) The Forest Service cites to footnotes in Attachment A of the SDN/FONSI – the mitigation measures and monitoring for the CuMo Project. (Dkt. 27 at 14) (CU080312, 080321.) Those footnotes discuss the MEP standard found in 36 C.F.R. § 228 and states: "Avoidance of impacts to LESA is the objective where practicable. Where avoidance is not practicable..., then activity impacts on LESA plants will be minimized to the MEP." (CU080321 at nn. 1, 3.) These measures are sufficient to satisfy the requirements to maintain the LESA habitat and protect forest resources.

Further, the Project contains limits on the number of drill pads and drill holes. (CU080278.) Once a drill pad is no longer needed, the mud pits will be backfilled with native soil material, compacted, and re-contoured. (CU080227, CU080281-82.) Upon completion of the Project, Idaho CuMo is required to reclaim the temporarily constructed and existing roads as well as the drill pads. (CU080284-85, CU084015.) These features of the Project satisfy the reclamation or restoration requirements of NFMA and the Organic Act.

Consistent with its ruling on the NEPA claim, however, the Court finds the Forest Service failed to re-evaluate the baseline data for LESA following the Grimes Fire prior to approving the Project. Without an accurate baseline, the Project's monitoring and mitigation measures will not be effective or accurate. Failing to obtain the necessary baseline is contrary to Guideline BTGU01 because the Forest Service did not determine the existing suitable habitat for and presence of LESA within or near the project area. (CU053833.) For these reasons, the Court finds the Forest Service was arbitrary and capricious and in violation of

**MEMORANDUM DECISION AND ORDER    41**

NFMA. The Court will grant the Plaintiffs' Motion for Summary Judgment as to the NFMA claim and deny the Motion as to the Organic Act. Defendants Motions for Summary Judgment are granted as to the Organic Act claim and denied as to the NFMA claim.

## ORDER

NOW THEREFORE IT IS HEREBY ORDERED as follows:

1) Plaintiffs' Motion for Summary Judgment (Dkt. 19) is **GRANTED IN PART AND DENIED IN PART**.

2) Intervenor-Defendant's Motion for Summary Judgment (Dkt. 25) is **GRANTED IN PART AND DENIED IN PART**.

3) Defendants' Motion for Summary Judgment (Dkt. 27) is **GRANTED IN PART AND DENIED IN PART**.

4) Defendants' Motions to Strike (Dkt. 23, 26) are **GRANTED IN PART AND DENIED IN PART**.

5) The SEA and SDN/FONSI are vacated with regard to the decisions concerning LESA as stated herein. The Forest Service is directed to complete a re-evaluation and analyze the same to determine whether the Project will significantly impact LESA. The Forest Service shall then file an amendment or addendum to the SEA and SDN/FONSI, as appropriate, discussing its findings and conclusions with regard to the Project's impact on LESA.

6) This case is **ADMINISTRATIVELY CLOSED** subject to reopening, if necessary, following completion of the re-evaluation and any required administrative review process.

Dated: **July 11, 2016**

Honorable Edward J. Lodge
United States District Judge

**MEMORANDUM DECISION AND ORDER**   42